Our final case for argument today is 23-1831 Hallock v. DOJ Mr. Sincar, please proceed. Good morning, may it please the court. My name is Robert Sincar and I'm here representing Michael Hallock. This appeal challenges a decision of an MSP administrative judge affirming the removal of Mr. Hallock from a position as an assistant U.S. attorney in the Northern District of Mississippi. We have several different issues, but the central claim that we make here that this court, I think, needs to address and justifies reversal is that the record here is corrupted by a foundational legal error. And that is, both in the decision making at the Department of Justice and in the AHA's affirmance, they studiously excluded all evidence of Mr. Hallock's successful performance. So, right from the beginning in the PIP, the Performance Improvement Plan, Deputy Chief of the Criminal Division, Susan Bradley, was in charge of that operation. She wrote the proposed removal and she admitted that she did not consider any of the positive work that was Where did she admit that? I'm sorry? Where did she admit that? You said she admitted she did not consider any of the positive work. Where did she admit that? Appendix page 1028 is where we have some of that discussion, Your Honor. She also admitted, for example 1028? Yes. Okay. It's also quoted in our brief on page, opening brief on page 27. Okay. Where on 1028 did she admit it? Page 1028. Yes, I'm on 1028. There's actually several parts to that point. There's not just one page I want to cite you to. But the Sorry, it goes really from 1026 to 1028. It was a discussion we had back and forth. So, for example, part of the proposed removal discussion I just need to know a page number and a line number, counsel. What part of this, where did she make this admission? All right. Appendix page 1026. And the discussion starts on line, on page 103, line 2. And it goes over the next several pages. And we're talking about the names of various probation officers that Mr. Hallett worked with who complimented him. And the reason why we got into that discussion, so it goes over those next couple pages there, the reason why we got into that discussion is because in the proposed removal there's references to unnamed probation officers who complained about Mr. Hallett's work. And so our effort was to both find out who they are so we could respond to them, but also to point out in the course of these proceedings that Mr. Hallett had received compliments from probation officers. And, in fact, also if we Let's see. The Ultimately what happened in the hearing here, it gets truncated because the administrative judge rules that positive information about the performance of Mr. Hallett is not relevant. It's only the bad things he did. Okay. I don't know what you're talking about. I don't see the admission. The most I see here is this particular person saying on page 104 that she has never heard any of these You or whoever is doing the questioning says, are you familiar with this person? Are you familiar with this person? Are you familiar with this person? And then ultimately say, do you know that all these people give him compliments? And her response is, I have never heard compliments from any of those gentlemen about Mr. Hallett's work. No. So what she said is nobody presented her with any proof or ever called her and complimented him. So you're saying she didn't take into account positive work. She took into account all the things that she was made aware of. Your Honor, respectfully, I think you're flipping what's going on here. This is in the context of a PIP, which she is running. Excuse me. I'm sorry. I'm just getting over a cold a little bit. Which she is running, and she's doing the investigation. And so what you see here, it's not that people are supposed to call her. It's she directed the investigation, and she did not inquire. For example, the number of agencies that Mr. Hallett worked with. And if you're trying to investigate whether someone's doing a good job, it would be incumbent upon her, because it's her investigation, to see what other agents who worked with Mr. Hallett, what their view was of his work. And she didn't do that. That's a slightly different argument than saying you can point to an admission where she says, no, I didn't consider any positive information. Well, yes. I mean, I apologize if it came across as if she had that admission. Part of the problem is that the administrative judge cut me off to pursue what she did or did not do on the proposition that that was not relevant, that exploring what positive performance of Mr. Hallett she considered in making her proposed removal. Were all the performance evaluations over the years, weren't they in the record? Yes. And there was a lot of positive in there, you would say. So how can we make an assumption that that was not considered by either the U.S. Attorney's Office or by the Board? Well, it's curious in the way the record reads in that regard, Your Honor. So we have positive reviews. I mean, he starts out in 2016, 2017, he transitions to being a regular AUSA and he's addressing some issues. 2018, he has reviews that applaud what he's been doing and how hard he's been working. And all that's laid out out of that record, isn't it? It's not laid out. I mean, it exists. But the question is, is that you have in 2019 his midyear review and that is brief, but it's you're doing great, keep doing what you're doing. And then two months later, he gets the PIP. And so what you have is in that record, there's no explanation of how any of what went before could fit there. As this Court said in Santos, that the question of the PIP is not just whether it gives notice to the employee of any problems, but whether it's justified. And I would submit on this record, you can't find out why the PIP was justified. And even when you get to look at other components of the record, because the record is not just Ms. Bradley's testimony, but the designing official at the Justice Department, Ms. O'Rourke. For example, we put in letters from judges and other law enforcement folks that Mr. Hallett worked with and who complimented him, said he did a great job and so forth. And the Board expressly references that evidence at 829-30, does it not? I'm sorry, who referenced that? 829-30. Isn't that the Board opinion? I also consider the fact that the appellant submitted several reference letters from judges or representatives from other agencies who spoke highly of him. Right. But the Justice Department totally discounted that. So the Justice Department's decision is what the AJA was reviewing. So your argument, you acknowledge that the Board, the administrative judge, considered that as a positive evidence. No, I don't believe she did. I think she followed the thinking of the Justice Department, because we explicitly challenged that decision of justice to not consider, for example, the judges, law enforcement agents that were recommending Mr. Hallett, and the rationale for that was because they didn't supervise him. Nevertheless, unnamed judges and unnamed probation officers that supported and that were referred to in the removal papers, the deciding official credited. And so that inconsistency, and I think that the AJA embraced all that. I don't think she challenged it. She didn't make findings separate from the Justice Department. She affirmed what the Justice Department did. So she didn't say, no, they were wrong here, and I'm going to consider this even though they didn't. But so the problem that you have is that the record here doesn't really even let you fairly evaluate the criticisms that are in it. So first of all, it's not just a matter of the overall amount of evidence. So it's not just here's a pile of bad things, here's a bigger pile of good things, or vice versa. It's not just at that gross level. But it is actually understanding the specific performance issues that they claim Mr. Hallett had. So, for example, there's a case, U.S. v. Cyrus Smith. I think we have a typo in one of our briefs of Cyrus Vance. But the criticism in the proposed removal was that in a mock trial, he didn't do very well in asking direct questions of an FBI agent who was practicing for a trial. Now, the evidence that we weren't allowed to get in and is not in is that that case was run by a senior assistant U.S. attorney, Mr. Mims, and had asked Mr. Hallett to just help out like a couple minutes before, read these questions for direct, but then I'm going to do a cross-examination of the FBI agent to prepare him for the case. Fine. Now, Ms. Bradley, who wrote the removal decision, she was not part of that, but she watched. She wasn't part of that assignment. She came there and watched what Mr. Hallett did. Mr. Mims thought that Mr. Hallett did fine and, in fact, asked Mr. Hallett to help him prepare other witnesses for the actual trial of the case. So, you know, the notion that his preparation in that particular instance of the mock trial was somehow something terrible is a judgment that has to be understood in the broader point that the AUSA who was in charge of the case felt he did just fine and that his work was excellent. You're saying now that's in this record? I'm sorry? You're saying now that's in this record? No. We put it in, but they did not consider it, no. So it's not in the record. What did they not consider? If something's in the record or it's not in the record, then there's whether it was considered or not. Those are two different issues. Is this – I'm finding your argument very difficult to follow. Is this evidence in the record? The evidence of Mr. Hallett helping out with the trial of these – I'm not exactly sure what issue you're looking at here, Your Honor. The proposed removal rested on – and this is just this one example, and I'm just using it as an example of how limited the record is. And so how you – So I understand that Mr. Mims, the senior OSO, said perhaps closing the client. Is that in the record? The fact that he asked our client to work with him and do that – yes, Mr. Hallett testified to that. And so your contention is that it was overlooked by the deciding official and or the judge? Correct. Correct. And both the judge also overlooked it? The illustrious judge, yes, yes. And in part, the – again, that comes down to her point that is really quite simple, which is that positive performance shouldn't be considered in the context of these proceedings. I mean, that – I don't see anywhere where anyone said that. I don't see the deciding official saying that. I don't see the board saying that. I don't see anyone saying they're not going to consider positive performance. The – on page – well, we quote it in big print on page 27. Let me send it over. I have an opening brief, and that cites to page 1028, which is tiny print. But the – when I tried to cross-examine Ms. Bradley about not considering any of Mr. Hallett's satisfactory performance, she said, quote, Mr. Sinkar, proposed removals on performance do not usually identify instances of positive performance. It's a proposed removal for unacceptable performance, so they cite or give examples of unsuccessful performance. And I understand it doesn't mean that 100 percent of the things he did was unacceptable. My response was essentially a straightforward articulation of the substantial evidence standard. That's true, Your Honor, but the law with respect to the substantial evidence that the agency has to prove requires that they consider the whole record, including evidence that detracts from their proposed conduct. And so – and so it would be incumbent upon them, if there were such satisfactory performance, to explain why, in fact, they did not – that did not detract from their conclusion that removal was appropriate. I had wanted to reserve some time for rebuttal, and so I have a few seconds left. If I could pause here. That's fine. Yep. Okay. May it please the Court. The Court should affirm the decision of the Board because it was not arbitrary, capricious, and of use of discretion or otherwise not in accordance with the law, and it was supported by substantial evidence. If I could please just first turn to counsel's argument regarding substantial evidence. Counsel appears to be arguing that this decision by the Board is not supported by substantial evidence and not based on attacking specific incidents of deficient performance. Overall, throughout the proceedings, it appears that Mr. Howlick more or less agrees that these incidents took place. Give me an example of some of the incidents. For example, Your Honor, there was the Rafe case that came down from the Supreme Court, which changed the elements that the jury had to be advised on. And multiple times prior to the PIP being instituted, it was brought to Mr. Howlick's attention that these elements had changed and that they needed to be properly instructed on. And prior to the PIP, in indictment documents presented to his supervisors and to the Court, he improperly articulated the elements of the offense. And then once they were in the PIP period, he again improperly instructed the grand jury on the elements of the offense, and his supervisor had to stand up and actually correct that misinterpretation. Here he seems to be arguing that there was not substantial evidence to support the Board's decision because the decision official did not take into consideration some positive character letters presented by Mr. Howlick. And we contest that that's not what the record supports. Ms. Orr, the decision official, on page 1054 of the record, indicated that she weighed all the evidence, but also articulated that those character letters was not referencing performance during the PIP period. Where are you in the 1054? And actually, Your Honor, I would also direct you to the decision letter at page 143, where she articulates what she considered, which included the documents provided by Mr. Howlick. Now, one other thing I'd like to bring to the Court's attention in regards to these character letters. 1143, where does she mention the documents? If you're going to refer me to a page. Yes, Your Honor. At the bottom of 143, after a careful and thorough review of the record, including the proposal, the attachments, your written response, and attachment in your oral reply, which includes these character letters. Actually, she goes into more detail, doesn't she, on page 149 and 150? Where she, they, I don't know who this is. 149 and 150, is this the same thing, or is this something different? 149 to 150, she again addressed is the. . . She acknowledged several letters of support from individuals with whom you have worked, are appreciative of your efforts, extol the diligence with which you've performed your duties. However, those individuals are not responsible for supervising you on a daily basis, nor are they tasked with reviewing and evaluating your work on matters. It's your supervisor's assessment that matters in my consideration of this proposal. So has she rejected entirely everything else because they're not supervisors? Your Honor, I believe she made a credibility determination and said. . . She found those people not credible? Well, for one, they weren't referencing specifically conduct during the PIP performance, the performance period that was in question. So it didn't directly refute the issues that were presented. The other matter I'd like to draw the Court's attention to is these letters seem to be brought to contradict this general allegation that judges and probation officers were critical or upset with Mr. Hollick's performance. But that's really not an issue that was before the Board. The United States Attorney for the Northern District of Mississippi, footnote 5 on his decision letter, stated that he wasn't considering the judge's inputs as a basis to find substantial evidence to support the instances of deficient performance. And then Ms. O'Rourke goes on to say that she didn't consider the probation officer's comments. And so what this general character letter seemed to be attacking are these general assertions by probation officers and judges about his deficient performance, which the decision officials did not use as a basis to find deficient performance. So that seems to go to what the deciding official did with his positive evidence. How about the administrative judge and the objection at the hearing? How could we be confident that the Board actually considered all this evidence as well? Your Honor, the Board also considered all the evidence that was put before them. And there's nothing in the record to indicate that they otherwise rejected it. The Board explained that we're here to decide whether your deficient performance rose to a level that required an unsatisfactory performance review. And so they took into consideration everything that was put before them, including everything that Mr. Horwick put before them. He had an opportunity to provide evidence to refute the specific allegations of deficient performance. And all decisions indicate that the Board took that into consideration. Ultimately, the decision to remove him was based on poor performance in case handling, poor performance in his advocacy, and poor performance in his writing. So pretty much across the Board. Three of the five critical elements, Your Honor. And were each of them, I'm just curious, do each of them independently support removal, or was it collectively that they support removal? Your Honor, I don't believe that they articulated whether it was one or all of them that supported removal in the decision. But the Santos case says that just deficient performance, even just one critical element, is grounds for removal. I don't really understand. Do you understand the appeal to be arguing these underlying three elements, or to be arguing mainly that there was also positive stuff that should have been weighed? My understanding is simply that Mr. Horwick believes that there was positive information that should have been weighed that was not weighed. But that is all to say that he had due process in these proceedings. He was permitted to testify before the administrative judge, provide an oral statement, provide written comments. And so he had every opportunity to bring these matters to the attention of the decision official. And every indication in the record is that they considered all matters before them in reaching their decision. He also seems to be troubled by what he would say was a very quick change of view of his superiors, of his performance. He characterizes that through July, I think it was, of 2019, they would pat him on the back and tell him, everything's fine, you're doing great, keep up the good work. And only two months later they put him on a pit. Is that a fair interpretation of the record? No, your honor, I don't believe that accurately reflects the record evidence. In the record we have, in 2017, going back as early as 2017, his supervisor, Mr. Norman, providing him a pretty severe letter articulating all the deficiencies in his performance. His ultimate performance report, or performance work report for 2017, while it was satisfactory, almost every critical element said, you've got issues, there's multiple things that you have to improve. 2018, while it said it was satisfactory, it again says, we see you're trying, but does not get by any means a glowing review. 2019, you have testimony from Mr. Norman that he was, if not daily basis, very routinely giving oral feedback as to the issues that Mr. Hollick was continuing to experience. Then when it got to the midterm feedback in July, he did have a very quick informal discussion with him that said, keep up the good work. He explained that in his testimony to the administrative judge, in which he explained that he, at some point, this becomes a little demoralizing. He wanted to continue to encourage him to become a good prosecutor. They hadn't had any incidents leading up to that performance review for several weeks. Then very quickly after that performance review, we have almost two months of multiple incidents of deficient performance, which led to be the basis for the PIP. So looking at the record as a whole, overall, I don't think that accurately reflects the issues. Any further? No, no, no. Unless the court has any further questions. Thank you, counsel. We'll restore two minutes of rebuttal time. Mr. Sinkai, please. Just briefly, Your Honor, I appreciate your indulgence here. I think the key point here that I was trying to get out, and I disagree with my colleague, is that it is not true that either the board or certainly DOJ considered everything, and that objection that was sustained by Judge Dela Cruz is key to that, because what you see from the performance reviews is exactly, okay, 2016, he goes to the Northern District of Mississippi in this unique position. 2017, new administration, and he has shaking issues and he works hard. And then 2018, what you see is a very positive trend line for him. For example, on Appendix 195, and this is from the 2018 PWP, he says, Mr. Halleck has made noticeable efforts to improve and sharpen his presentation and advocacy skills during the reporting period. He is learning what is expected of him and is adjusting from being in the more relaxed reentry court setting to the demands of the more formal courtroom setting in regular U.S. District Court proceedings. On Appendix 198, Mr. Halleck has successfully authored several motions and appeals this year that demonstrate his abilities to research and analyze issues. He has continued to improve his writing skills during the previous period. And then on Appendix 194, among other things, many of his coworkers and his supervisors have noticed and appreciated his increased efforts to more fully develop his own skills and to help the office. So you've got that trend line. You have the mid-year review in July of 2019. And suddenly, two months later, you have the PIP. What I was trying to do is to understand. The PIP is incredibly well-documented. There's a million details in this PIP. I don't honestly think I've ever seen a PIP that is more thoroughly detailed with all of the problems in his performance over those two months. It's catastrophic. I don't understand how you're standing on making this argument. Maybe he was great, but then he fell off a cliff work-wise. And they detailed it in exasperated detail, and you're not even really challenging all these individual instances of him showing up unprepared to things, his poor writing. And it's all documented. I'm baffled. Well, Your Honor, first of all, the point here is not to get this Court to re-weigh that evidence. My point is that that was a very narrow sliver of what his work involved. And that when you perform poorly, you're put on a PIP. And then they evaluate your work during the PIP period to see if you can improve. These specific elements that they've identified for you clearly are deficient. In his case, three of his five performance criteria were deficient. They gave him lots of detail on what he needed to do to make it better. It didn't get better. And then they documented in lots of detail how it didn't get better, going through each one of those. If you're given a period of time to improve, you don't improve, you're gone. Your Honor, respectfully, we articulate this, I think, in some detail in our briefs, but there was – our point is twofold, which is why I respectfully disagree with you, is that in the PIP itself, that there were lots of other things that they excluded that were going on, and this is part of this issue of positive performance. But even before that, the threshold question that I was trying to understand with my cross-examination here was what this court taught in Santos, which is that a PIP has to be justified. So the PIP itself cannot justify itself. It's notice. But two months after having this good performance, good review, suddenly he's on a PIP. That has to be justified. And so what I was – Are you saying the PIP didn't give a lot of examples and details about why it was justified? No, it didn't. It didn't be – it didn't – it was all post-July. And so part of what I was trying to figure out was the – it was in the title of the PIP. It was in the PIP. Yeah, I'm sorry. So the point is, is that there are two components here. One is the PIP has to be justified. And you're right, Your Honor, I guess it's possible for any human being, his performance could suddenly fall off a cliff. In my experience, that's not likely, but it's a possibility. But then also the point is that there was lots of evidence of – that we tried to put in the record, and some of it got in there, of positive performance by Mr. Halleck. Okay, this is it. We have our time. I want to thank both counsel. The State Bargaining is taken under submission.